UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TAMRA RETLICK,

        Plaintiff,

v.                                                            Case No. 10-C-1067

MICHAEL J. ASTRUE,

        Defendant.

**DECISION AND ORDER**

This is an action for judicial review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. 42 U.S.C. § 401 et seq. For the reasons that follow, the Commissioner's decision will be reversed and the case remanded for further proceedings.

**I. BACKGROUND**

Plaintiff Tamra Retlick applied DIB on April 11, 2006, alleging disability since August 15, 2004. After her application was denied initially and on reconsideration, Plaintiff requested an administrative hearing. The administrative judge (ALJ) held a video hearing on January 7, 2009, at which Plaintiff, who was represented by counsel, and a vocational expert testified. In a decision dated March 4, 2009, the ALJ found the Plaintiff had no severe medically determinable physical impairments, but did have several severe non-physical impairments, including bi-polar disorder, a

history of alcohol abuse, attention deficit disorder without hyperactivity, and post traumatic stress disorder (PTSD). The ALJ concluded that Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with the following non-exertional limitation: she was limited to simple work with no public contact and occasional contact with peers. With this limitation, the ALJ found that Plaintiff remained capable of performing work she had done in the past as a garment folder. Alternatively, the ALJ found that given Plaintiff's age, education, work experience, and RFC, there were a significant number of jobs in the national economy that she could perform. Based on these findings, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. The ALJ's decision became the Commissioner's final decision when on October 1, 2010, the Appeals Council denied Plaintiff's request for review. Plaintiff thereupon commenced this action for judicial review.

In support of her request for judicial review, Plaintiff argues that the ALJ erred in his assessment of her credibility, in assessing the treating source statements, in formulating her RFC, and in finding that she was able to perform either her past work or other jobs that exist in the national economy. Because of these errors, Plaintiff contends that ALJ's decision should be reversed and the case remanded for further consideration.

## II. STANDARD OF REVIEW

In reviewing an ALJ's decision, a federal court examines whether it is supported by substantial evidence. *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*,

402 U.S. 389, 401 (1971)). An ALJ need not specifically address every piece of evidence, but must provide a "logical bridge" between the evidence and his conclusions. *O'Connor-Spinner*, 627 F.3d at 618 (citing *Getch v. Astrue,* 539 F.3d 473, 480 (7th Cir. 2008)). An ALJ's credibility determination is entitled to special deference because the ALJ has the opportunity to observe the claimant testifying. *Castile v. Astrue,* 617 F.3d 923, 928-29 (7th Cir. 2010). "Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading." *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010). Accordingly, credibility determinations are reversed only if they are patently wrong. *Id.* The ALJ is also expected to follow the Agency's own rulings and regulations in making his determination. Failure to do so, unless the error is harmless, also requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006).

### III. ANALYSIS

**A. Credibility Errors**

Plaintiff testified that she was thirty-six years old. She had graduated from high school and then went on to cosmetology school. She was married and lived in a home in Appleton with her husband, who was a sheet metal worker. They had no children. She had previously worked as a cosmetologist, retail sales person, customer service representative, and did computer data entry. She had also folded T-Shirts and sweatshirts for a clothing manufacturer. Plaintiff testified she was currently unable to perform any employment, however, even her job folding T-Shirts. When the ALJ asked her why not, she responded, "It was extremely stressful. I would have a difficult time getting up early and getting myself dressed and getting myself to work." (Tr. 30.) Plaintiff further testified that "I would have a hard time remembering to take my meds that early in the morning.

Also, eating habits would be a problem. When I worked there I was anxious and would be stressed out most of the time." (*Id.*)

It is this testimony, as well as Plaintiff's self-reported limitations, that the ALJ found "not credible to the extent they are inconsistent with the above residual functional assessment." (Tr. 16.) Had the ALJ credited Plaintiff's testimony concerning the effects of her mental impairment, a determination of disability would necessarily follow. Plaintiff contends that the ALJ's credibility determination is erroneous because the ALJ did not explicitly apply the seven enumerated factors of SSR 96-7p. Plaintiff contends that the ALJ instead offered the same boilerplate explicitly rejected by the Court in *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010), and then proceeded to erroneously analyze the evidence relating to her credibility.

The Seventh Circuit has frequently and recently addressed the deference owed to the ALJ's credibility determinations:

> The ALJ's credibility determinations are entitled special deference, *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir.2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying."); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000), but the ALJ is still required to "build an accurate and logical bridge between the evidence and the result...." *Shramek*, 226 F.3d at 811 (internal quotation marks omitted). "In analyzing an ALJ's opinion for such fatal gaps or contradictions, we give the opinion a commonsensical reading rather than nitpicking at it." *Id.* (internal quotation marks omitted). Accordingly, we will overturn the ALJ's credibility determinations only if they are "patently wrong." *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir.2008).

*Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir.2010).

In this case, the ALJ gave several reasons for discounting Plaintiff's credibility. The ALJ noted no significant or unusual mental health or medical event occurred on or around Plaintiff's alleged onset date of August 14, 2004 that would support her being disabled on that date but not

4

before (especially considering she had the same mental health impairments since grade school). (Tr. 17, 535–37.) The ALJ also found Plaintiff's work history was not commensurate with someone disabled. (Tr. 17.) Plaintiff admitted in her disability report she worked until December 15, 2005, over one year after her alleged onset date. (Tr. 111–12.) Plaintiff also reported that she was a Mary Kay consultant in May 2005 and that she had also been working a sales job for the last three months that required her to work ten-to-twelve hour days. (Tr. 215, 217.) At the hearing Plaintiff even testified that she had worked as recently as March 2007. (Tr. 29–30.) This work history, the ALJ concluded, is inconsistent with Plaintiff's allegations of disability.

Regarding her non-employment activities, the ALJ noted that at the Christian Family Counseling Center in September to December 2008, Plaintiff described "what could be characterized as an active but normal social life." The referenced notes indicate that she continues socializing with friends, visiting her grandparents and exercising. She and her husband had acquired a dog, which Plaintiff house-trained and was now walking regularly. She was cleaning her husband's aunt's house, and had met several new friends with whom she joined for a "ladies night out" once a month. (Tr. 496-97.) The ALJ noted that this was consistent with her reported lifestyle in January 2006. According to an initial evaluation completed at that time, she reported that she exercised regularly, including Yoga, Pilates, and weightlifting. She was going to the gym two or three times a week, liked to read, and enjoyed relaxing to meditative music. (Tr. 17, 284.) The Christian Family Counseling note from June 2007 likewise describes an active social life. At that time Plaintiff described keeping busy gardening and visiting grandparents. She was continuing to exercise, trying out a Mediterranean diet, "feeling pretty good about herself and trying to lead a

healthy lifestyle." (Tr. 501.) She was looking into a 401k plan for the future and was committed to being more of a caregiver to her grandparents. (*Id*.)

Finally, the ALJ noted that Plaintiff made inconsistent statements about her exact dates of employment. She also testified that she was able to walk for 30 minutes, stand for an hour, and sit for only two hours, even though the record contained no evidence of a physical impairment related to her ability to walk, stand or sit. (Tr. 17.)

On the surface, these would seem logical reasons to discount the credibility of a person claiming they are incapable of performing any gainful employment that exists in the national economy. The fact that a person states she has been unable to work since August 15, 2004, but then admits that she continued to work until December 15, 2005, might cause a reasonable person to question the claimant's credibility. So, too, would a claim of physical limitations in the face of a complete absence of medical evidence of physical impairments, and conflicting or inconsistent statements under oath regarding one's work history. Working out at the gym, spending leisure time reading, gardening, training and caring for relatives and a dog, cleaning other peoples' homes, and visiting with grandparents and friends are not what we normally think of when we picture a person disabled as a result of severe depression or bipolar disorder.

Plaintiff argues the ALJ's analysis is nevertheless deficient because he failed to follow the procedure for assessing a claimant's credibility set forth in SSR 96-7p. Specifically, Plaintiff contends that the ALJ failed to consider the frequent adjustments in the type and dosage for her medications, whether they were effective and their side-effects. Had he done so, Plaintiff argues, he would have noted that her medications were being constantly adjusted to keep up with her symptoms and they never worked for long. Instead of following the procedure set forth in the

6

Agency's ruling, Plaintiff contends that the ALJ offered conclusory statements without explaining how the evidence he referenced affected her credibility. Finally, Plaintiff accuses the ALJ of "cherry picking" statements in the medical record indicating normal functioning but then ignoring those evidencing significant difficulties. Plaintiff notes that bipolar disorder is cyclic by nature and thus one would expect peaks and valleys, good days and bad days. Ultimately, she contends that the ALJ failed to build a logical bridge explaining why her testimony that she could not handle even simple routine employment on a continuing basis was not credible.

Plaintiff is correct that the ALJ here, as in most cases it seems, began his credibility analysis with essentially the same boilerplate language that been explicitly criticized by the Seventh Circuit in several cases. After finding that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 16.) The Seventh Circuit has described credibility determinations similar to the one at issue here as "meaningless boilerplate." *Parker v. Astrue,* 597 F.3d 920, 922 (7th Cir. 2010). Stating the claimant's RFC first, and then rejecting as "less than credible" those statements of the claimant that are inconsistent with that RFC, may give the appearance that the credibility determination is arrived at after the RFC is determined, instead of serving as part of the analysis that is used to determine the claimant's RFC. *Bjornson v. Astrue,* 2012 WL 280736, *4 (7th Cir. 2012) (criticizing SSA's use of "templates"); *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 788 (7th Cir. 2003).

But the mere fact that the manner in which the decision is written gives such an appearance is not alone grounds for remand. The question is whether the ALJ built a logical bridge between

7

the evidence and his findings, not whether the ALJ's articulation of his decision follows a particular order. The danger of using boilerplate is that it could substitute for the required analysis and thereby preclude a reviewing court from discerning the actual basis for the ALJ's credibility finding. *Bjornson,* 2012 WL 280736, *4 ("Such boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible.") (quoting *Hardman v. Barnhart,* 362 F.3d 676, 679 (10th Cir. 2004).) When the ALJ actually provides discernible reasons for his credibility finding, a reviewing court is provided with adequate information to review the ALJ's determination, despite the unfortunate use of boilerplate. In this case, the ALJ gave reasons for his credibility determination; the question is whether they constitute substantial evidence, bearing in mind that the ALJ's credibility determination is accorded special deference.

To the extent that Plaintiff's argument is that the ALJ did not conclusively establish that she was lying or mistaken about the extent of her limitations, she is of course correct. Inconsistencies in her testimony and reports concerning her work history may be due to memory lapse or confusion, itself due to the mental illness. There may be an innocent reason that Plaintiff listed her onset of disability date more than a year before she actually stopped working. Plaintiff's testimony concerning physical limitations could likewise be the result of confusion caused by her mental impairment. Confronted with such evidence, a trier of fact may infer either innocent error or intentional falsehood. Ultimately, only the Plaintiff knows for certain, but claimants do not determine their own credibility. For obvious reasons, the trier of fact, here an ALJ, is entrusted with that responsibility. ALJs can be wrong, but an ALJ's credibility determination should not be overturned because there is a possibility of a benign explanation for a claimant's inconsistencies.

8

"Judicial review of administrative decisions is deferential." *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). If a claimant's apparently inconsistent statements must be absolutely impossible to reconcile before a claimant's credibility can be found lacking, then no claimant can ever be found incredible.

Plaintiff also criticizes the ALJ for failing to consider the frequent changes in her medication. It is true that the medical records reflect changes in Plaintiff's medication, sometimes on a frequent basis. But the records do not indicate functional limitations from the medications or adverse side-effects of a significant nature. Neither Plaintiff, nor her attorney, suggested at the hearing that her medications, despite changes over time, were causing problems. Under these circumstances, the ALJ's failure to specifically address medication was not error.

In sum, Plaintiff testified that she could not hold any employment, not even performing simple routine tasks such as folding T-shirts, because she would have a difficult time "getting up early and getting myself dressed and getting myself to work." (Tr. 30.) She testified that she could not deal with the stress of full-time employment, that she would have a hard time remembering to take her medication and maintaining regular eating habits. Having a difficult time doing something is not the same as being unable to do it. Many people go to work every day even though they have difficultly getting up in the morning and experience a great deal of stress. In light of the inconsistencies noted by the ALJ and the general activities she described in the various reports, the ALJ's finding that Plaintiff was not credible to the extent she claimed she could not perform even routine low-stress work on a regular basis is not patently wrong. Plaintiff is not entitled to remand on this ground.

**B. Assessment of Medical Evidence**

Plaintiff also argues that the ALJ erred in assessing the medical evidence in the case, particularly, the opinions of her treating psychologists. Her argument on this issue is more persuasive. Dr. Allen, who treated Plaintiff for more than a year, filled out a treating source statement on March 5, 2008, in which he rated as "poor or none" her ability to "maintain regular attendance and be punctual within customary, usually strict tolerances" because her mood was too unstable. (Tr. 447.) Dr. Allen noted in this regard that Plaintiff "crashes suddenly and unpredictably into profound depression." (*Id.*) Dr. Allen rated her ability to "complete a normal work day and work week without interruptions from psychological based symptoms" as "poor or none." (*Id.*) He rated her ability to "perform at a consistent pace without an unreasonable number and length of rest periods" the same. (*Id.*) Dr. Allen anticipated that Plaintiff's impairments or treatment would cause her to be absent from work more than twice a month. (Tr. 448.) Her ability to deal with normal work stress was poor or none, and Dr. Allen noted marked functional limitations in her activities of daily living and her ability to maintain social functioning. She had constant deficiencies of concentration, persistence or pace resulting in failure to compete tasks in work situations or elsewhere in a timely manner, and continual episodes of deterioration or decomposition in work or work settings.

Somehow, the ALJ construed Dr. Allen's evaluation to indicate that Plaintiff could perform simple work. (Tr. 18.) The ALJ then credited that purported part of his opinion, but rejected the balance as "not consistent with the record as a whole, including Dr. Allen's treating notes." (*Id.*) Although Dr. Panzer, who replaced Dr. Allen after he retired, reached essentially the same conclusion, the ALJ found his evaluation entitled to less weight because he had only seen Plaintiff

three times. The ALJ also rejected the opinions of Plaintiff's psychotherapist/counselors, Margaret McEwen and Kathy Jasmin, who likewise thought Plaintiff incapable of because they were not acceptable medical sources to render the kind of opinions contained in the psychiatric questionnaires. (*Id.*) Instead, the ALJ credited the opinions of two consulting psychologists who had reviewed Plaintiff's records and concluded that she could perform simple routine work.

The ALJ's complete rejection of the opinions of Plaintiff's therapists simply because they are not "acceptable medical sources" under the SSA rules is contrary to SSR 06-03p, which states:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03P, 2006 WL 2329939 (S.S.A.). Rather than reject the opinions of Plaintiff's therapists, the ALJ should have evaluated those opinions based on the same kinds of factors that are used to evaluate acceptable medical sources. *Id.* at *4. Although their opinions may not be sufficient by themselves to establish the existence of an impairment, they can be given some weight, especially where they are based on long and frequent contact with the claimant and are consistent with acceptable medical sources who are also treating the claimant. *See Phillips v. Astrue*, 413 Fed. Appx. 878, 2010 WL 5421351, *7 (7th Cir. Dec. 23, 2010) (unpublished) ("Although the opinions of other medical sources are important and should be considered when evaluating 'key issues such as impairment severity and functional effects,' their findings cannot 'establish the existence of a medically determinable impairment.'") (quoting SSR 06–03p).

11

The ALJ also erred in his analysis of opinions of the treating medical sources, particularly Dr. Allen. First, the ALJ stated that Dr. Allen stated that Plaintiff was able to perform simple work. (Tr. 18.) If all the ALJ meant is that she was able to perform simple tasks, the statement is correct. But it appears the ALJ meant she was able to perform simple routine work on a sustained (eight hours per day, five days per week) basis, as he found it consistent with the opinions of the state agency psychologists who found her able to perform such work. The ALJ then stated he gave greater weight to this part of Dr. Allen's opinion than the opinion of Dr. Panzer, but rejected Dr. Allen's opinion as to Plaintiff's other work related mental limitations because "they are not consistent with the record as a whole, including Dr. Allen's treating notes." (Tr. 18.)

There is nothing in Dr. Allen's report that supports the ALJ's characterization of his opinion as supportive of Plaintiff performing simple work on a sustained basis. In fact, as noted above, Dr. Allen clearly said just the opposite. The ALJ's reliance on Dr. Allen as support for his conclusion that Plaintiff retained an RFC for simple work is therefore error, and the case should be remanded for that reason alone.

But the ALJ also failed to comply with the treating source rule in rejecting Dr. Allen's remaining opinions concerning Plaintiff's nonexertional limitations. Under the treating source rule, the opinion of a "treating source" is entitled to "controlling weight" if it is adequately supported by objective medical evidence and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). If the ALJ discounts the opinion of a claimant's treating physician, the ALJ must offer "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). The ALJ must then go on

to determine what weight to give to the opinion using the factors listed in § 404.1527(d)(2), including the length of treatment, the physician's specialty, and the types of diagnostic tests performed. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

Here, the ALJ stated he was rejecting Dr. Allen's opinions concerning Plaintiff's work-related limitations because they are inconsistent with the rest of the medical evidence and with his own treatment notes. But other than referencing a thirty-page exhibit, the ALJ never identified what evidence contradicts Dr. Allen's opinion. The ALJ never identified the rest of the medical evidence or the part of Dr. Allen's treatment notes that were inconsistent with his conclusion. For this reason as well, a remand is necessary.

**C. Step Four and Step Five Determinations**

Relying on the VE, the ALJ determined that Retlick could allegedly return to work as a garment folder. (Tr. 18.) The VE based her description of that job on Retlick's testimony, saying it was "SVP 2, unskilled." (Tr. 58.) The VE also testified Plaintiff could perform the requirements of representative medium and light unskilled occupations, such as hand packager (medium, 1.9 million nationally and 5,000 locally), racker of bakery products (light, 176,000 nationally and 400 locally) and basket filler (light, 148,000 nationally, 300 locally). (Tr. 58–59.) According to Plaintiff this is not enough for a Step Four denial of benefits. Plaintiff also argues the ALJ's hypothetical question did not properly account for all of her mental limitations at her folding job and that his RFC was based on an incorrect assessment of her mental limitations. (ECF No. 8 at 23–25.)

At Step Four of the analysis, an ALJ must not describe a claimant's previous job in a generic way, such as "sedentary" and conclude, on the basis of the claimant's residual capacity, that he

13

could return to his previous work. *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir. 1984). Instead, the ALJ must list the *specific* requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks (emphasis added). *Id.* at 509; *see* SSR 82-62 ("Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work."). Here, the ALJ failed to determine the specific requirements of Plaintiff's prior employment. His conclusion that Plaintiff was capable of returning to that previous employment is therefore flawed. However, the ALJ also proceeded to Step Five and found that based on Plaintiff's RFC, she could perform other jobs that exist in substantial numbers in the economy. Plaintiff challenges the ALJ's hypothetical, claiming it did not include all of the limitations set forth in the medical record.

An ALJ's hypothetical question need only include those limitations he found credible. *See Jones v. Shalala*, 10 F.3d 522 (7th Cir. 1993). Here, the ALJ included all the specific limitations he found to be credible; Retlick's argument that his limitations were not specific enough because they did not include all the limitations she wanted him to include thus fails. Plaintiff's argument in this regard is not really about the specificity of the ALJ's question but rather just a reiteration of her arguments about his RFC assessment. If the ALJ's analysis of the medical evidence was in error, then the RFC he formulated is wrong as well. On remand, the ALJ will have an opportunity to address this issue. If he concludes that Plaintiff's RFC contains additional limitations, obviously the hypothetical posed to a VE must be varied. Based on the findings the ALJ made here, however, I cannot say the Step Five analysis was in error.

14

**CONCLUSION**

This case is typical of many of the disability cases that come before the federal courts for review, and it is not without some uncertainty over what more an ALJ can be expected to accomplish that I send the case back. Mental illnesses, particularly depression and bipolar (but also some other impairments, such as fibromyalgia), pose serious problems to the administration of the disability portion of the social security program. These are impairments whose very existence, let alone their severity and degree of limitation, cannot be determined by objective medical tests or analysis. A diagnosis of depression, as well as the determination of the intensity, persistence and limiting effects of its symptoms, is based primarily upon what a patient says to her psychiatrist/psychologist or therapist about how she feels and what she can or cannot do. Although in theory the claimant has the burden of proof and the Commissioner's decision is entitled to deference from the courts, the Agency rules and regulations governing the assessment of the claimant's testimony and the opinions of treating medical sources seem to operate to the contrary.

In this case, for example, Plaintiff claims she cannot hold a job because she is likely to be absent too often because of her mental illness. Her psychiatrist agrees. According to the VE, a person who misses more than two days a month cannot hold full-time, or sustained, employment. Thus, the ALJ must determine whether Plaintiff and her psychiatrist's opinion are credible. Since bipolar disorder could produce such symptoms, the ALJ must proceed to assess Plaintiff's credibility under SSR 96-7p. That ruling requires the ALJ to consider, in addition to the objective medical evidence, the following factors:

1. The individual's daily activities;

    2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

    3. Factors that precipitate and aggravate the symptoms;

    4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

    5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

    6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

    7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7P, 1996 WL 374186, *3 (S.S.A.).

Moreover, it is not enough to simply list the factors, or provide a conclusory statement to the effect that the testimony has been considered but found not credible. Nor can a credibility determination be based on the obvious fact that the claimant has much to gain, literally tens of thousands of dollars and free medical care, if she is believed, since the same motivation exists for all claimants. Under Social Security Ruling 96-7p, the ALJ's determination or decision regarding claimant credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."

In a case such as this, the factors set out in SSR 96-7p provide little help in assessing a claimant's credibility. Plaintiff's daily activities, as described, above were quite normal. But as Plaintiff points out, the nature of bipolar disorder is that there are good days and bad days. The

Seventh Circuit, in particular, has been quite critical of ALJs for failing to appreciate the fact that mental disorders may be disabling even though the claimant seems quite capable much of the time. *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("Many of the reasons offered by the administrative law judge for discounting the evidence of Drs. Caspary and Chucka suggest a lack of acquaintance with bipolar disorder.").

The more fundamental problem with the ruling, however, is that the analysis it calls for is generally circular. This is because the information the ALJ is told to consider in assessing the claimant's credibility, especially in cases involving depression, is generally either directly or indirectly provided by the claimant; in other words, the ALJ is told to assess the credibility of the claimant's statements by using information contained in the claimant's statements. How does the ALJ or doctor, for that matter, know what a claimant's daily activities are, the duration or frequency of their symptoms, the factors that precipitate their symptoms, and other measures they use to treat their symptoms other than from what the claimant says? Even medication is given based on what the claimant tells the doctor, and once prescribed, the doctor must take the patient's word as to whether she has properly taken it. Thus, the ALJ is often left with little more than the claimant's own words to determine whether the claimant is telling the truth. As a result, unless the claimant offers testimony that is patently inconsistent to what she told her doctors, or what appears in her work history, it will be difficult for the ALJ to meet the requirements of SSR 96-7p and provide specific reasons for the finding on credibility, supported by the evidence in the case record so as to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Similar problems attend the treating source rule. As noted above, the treating source rule requires the ALJ accept the opinion of the claimant's treating physician or psychologist as "controlling" if it is adequately supported by objective medical evidence and is not inconsistent with other substantial evidence in the record. The typical medical evidence supporting a diagnosis of bipolar disorder consists of the clinical notes of the psychiatrist or psychologist which in essence describe how the claimant looks and recites what the claimant reports about how she feels and what she does. Thus, to a large extent, the diagnosis is based as well on the credibility of the claimant's statements. Is the treating physician in a better position to assess the claimant's statements than someone without a doctor/patient relationship? There are certainly reasons to wonder. The Seventh Circuit has urged reviewing courts to keep in mind the biases that a treating physician may bring to the disability evaluation. "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985). The Court has also noted "that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Even aside from these considerations, openly questioning a patient's honesty is not something most physicians would ever engage in for professional and liability reasons, and thus, ALJs are not likely to know if a doctor truly questions his patient's complaints. Also problematic is the fact that the physician's livelihood is dependent upon accepting the word of patients who come to them for treatment of real, not imagined or feigned, illnesses.

The effect of these rulings and others ALJs must follow would seem to be a reversal of the normal burden of proof in social security disability cases. Instead of the claimant having the burden of proving he or she is disabled, it appears that once a claim is made with the support of a doctor, the ALJ must disprove it. The claimant's testimony is presumed credible unless the ALJ can cite specific evidence in the record, a record usually limited to what the claimant offers, to demonstrate it is not. And her treating physician's opinion is deemed controlling unless it is inconsistent with other substantial evidence in the record. All this in a supposedly non-adversarial proceeding in which only the claimant has an advocate.

This would be fine if everyone who claimed they were disabled was actually unable to engage in substantial gainful activity. But, of course, that is not the case. As a result, we have a system in which a great deal of time and expense is spent in cases involving impairments whose existence and severity are simply not susceptible to easy and objective determination. It is also a system in which it is difficult to have much confidence in the result.

This is not to say that Plaintiff here is not disabled and entitled to DIB. That is for the ALJ or Commissioner to determine on remand in accordance with the procedural rules the Agency has implemented and the precedents provided by the Court of Appeals. On the basis of those procedural rules and precedents, I am satisfied for the reasons set forth above that the Commissioner's decision in this case must be reversed and remanded.

**SO ORDERED** this __26th__ day of March, 2012.

 s/ William C. Griesbach
William C. Griesbach
United States District Judge